## Fleet & Semple *vs.* Hollenkemp.

### APPEAL FROM KENTON CIRCUIT.

CASE.

Case 19.

July 8.

Judge HISE delivered the opinion of the court, which was suspended by petition for re-hearing until the 8th of July, when the petition was overruled.

4. Where a party discovers testimony, even after the argument has commenced, and it can then be given, it is his duty to ask that it be heard, and the duty of the court to admit it; if the party fail to offer it, it is no ground for a new trial. (2 *A. K. Marshall*, 43.)

2. Where a party is apprized of the points in issue, and goes into trial, it is no ground for a new trial, that after the trial he discovers testimony that would strengthen his case, especially if it does not show that a different finding would be the result of a new trial. (4 *Bibb*, 239.)

3. There is a class of cases where exemplary damages may be given by the jury, though the action be case and not trespass—as for injury to health, &c., arising from negligence. (10 *Con. Rep.* 388; 15 *Ib*. 235; *Harrington's Rep.* 483.) ·In this case the damages not deemed excessive.

4. Vendors of provisions for domestic use are bound to know that they are sound at their peril. (12 *Johnson*, 468; 3 *Black*. 165; 3 *Chit. Black*. 91.)

5. And it is the duty of druggists to know the properties of the medicine which they vend, and to employ such persons as are capable of discriminating and compounding according to prescription, and if they depart from the prescription, or ignorantly introduce other and poisonous drugs, they are responsible for the consequences to the party injured; and cannot escape responsibility by proof that they had been extraordinarily careful in general.

6. The rules in regard to the degree of diligence necessary to exempt a party from responsibility, in certain cases, do not apply to a case where a druggist is required to compound certain medicines, and *in doing so, he run them through a mill in which he knew* poisonous drugs had been ground, and failed to cleanse it properly so as to prevent the evil.

Case stated,
and judgment
of the circuit
court.

John Hollenkemp sued Wm. T. Fleet and Samuel P. Semple, partners in the business of vending drugs by retail, in an action upon the case, for having, through negligence, permitted a portion of the poisonous drug called cantharides, to be intermingled with some snake root and Peruvian bark which he had purchased at their drug store, and which he, being then indisposed, by the advice of his physician had taken as medicine for his restoration, not knowing that the poison had been mixed with the bark and snake root, and that in consequence he had been made very sick, endured great suffering, pain, and agony, and that his health had been thereby permanently injured. The defendants appeared, and pleaded not guilty. There was a trial, verdict, and judgment against the defendants for $1,141 75 damages, and costs of suit.

Grounds for
new trial, and
judgment over-
ruling it.

The defendants moved the court to set aside the verdict and judgment, and to grant them a new trial, upon various grounds, which may all be summed up and stated as follows :

1. Because of the discovery of important evidence made during the progress of the trial, for the first time, and which they allege they had neither the opportunity or power to procure and offer to the jury.

2. Because the damages found by the jury were excessive, and unwarranted by the facts of the case and the proof in the cause.

3. Because the court erred in giving the instructions asked by the plaintiff's counsel, and in refusing those asked by the counsel of the defendants.

The court refused to grant a new trial, and defendants' motion to that effect was overruled. The defendants filed their bills of exceptions to this and other decisions of the court given pending the trial. The evidence was reduced to writing and certified, and the defendants have appealed to this court.

The substance
of the evidence
adduced on the
trial.

The evidence collectively presents, in substance, the following state of fact: that the plaintiff having been sick for some time, had improved and was con-

valescent. A tonic preparation was recommended by the attending physician, who made out a written prescription for the plaintiff, as follows: that he should procure two ounces of snake root and two ounces of Peruvian bark, in the form of powder, to be mixed and divided into four portions; to be made into a tea, by the application of three pints of water to each portion of snake root and bark; the patient to take half of a tea cup full of the decoction twice each day. This prescription was sent by the plaintiff to the defendants' drug store to be filled. There the two ounces of snake root and two ounces of Peruvian bark were, by the clerk, in the presence of one of the defendants, put into a mill to be ground into powder, and passed through the mill, and thus pulverized. It was then put up in separate papers, as directed by the prescription, and delivered to the plaintiff's messenger, who carried them to the plaintiff. A tea was made of one of the potions. The patient drank a half tea cup full of the preparation, and, shortly afterwards, the effect produced by the dose was so unexpected and extraordinary that the same physician was sent for who had drawn up the prescription, who, upon his arrival, found his patient laboring under all those violent symptoms which, according to all the evidence on the subject, are produced by cantharides when taken in sufficient quantity into the stomach. The physician, his suspicions being aroused, procured and examined the three remaining potions of the medicine, as compounded at defendants' drug store, and easily detected the presence of Spanish flies in the mixture. They were taken to the drug store to inquire into the matter. There the potions were recognized as having been compounded and put up in that store, by the clerk, and the fact that some Spanish flies had been, in some way, mixed with the bark and snake root, was detected and admitted.

It is unnecessary to state in detail the symptoms and effects exhibited by the patient after taking one

dose of the tea as directed, the proof is conclusive and satisfactory that they were most violent, dangerous, and excruciating, and precisely such as would be produced by a sufficient dose of cantharides. It is true that there was contrariety of opinion expressed by the physicians examined, as to the durability and permanency of the injurious effects produced by this drug. The attending physician gave it as his opinion that the symptoms exhibited were produced by the cantharides, and that the plaintiff's health had been permanently injured by the dose which he had taken. Several other doctors examined, gave it as their opinion that generally the effects of this drug, unless taken in sufficient quantity to produce death, would be only temporary and evanescent. That they had never known an instance where the health of a person surviving the immediate effects produced by cantharides, had been permanently injured; though they did not deny but that such might be the consequence in some cases, where the peculiar condition of the patient's system was such as that the poisonous quality of the drug might be more pernicious and virulent in its effects, and that in special cases it might cause permanent ill health.

There was evidence introduced by the defendants, which was intended to screen and exempt them and their agent or clerk from the charge or imputation of having been guilty of inexcusable negligence in compounding and putting up the medicines—to-wit: the snake root and Peruvian bark—as required by the prescription furnished by the plaintiff's medical adviser.

The physicians examined as witnesses, all concur in proving that the violent and injurious effects produced upon the plaintiff by the dose which had been taken by him could not have resulted, if it had contained nothing but the snake root and Peruvian bark; that when taken in the quantities as administered to plaintiff, they are harmless and innocent drugs, and the fact, as deduced from all the testimony in the

cause, is conclusively established, that although the plaintiff sent them a prescription for snake root and Peruvian bark only, the defendants being druggists, sent him in return, say by mistake, a compound made up of the drugs required, intermixed with a most pernicious and deleterious poison, which, in fact, bears no kind of resemblance to the medicines named in the prescription, and the mingling of which with the innocent medicines sent for by plaintiff, was caused by improperly pulverizing the root and the bark, by grinding them in the same mill in which Spanish flies had been previously ground.

To sustain the ground taken for a new trial, that new evidence had been discovered pending the trial, which circumstances rendered unavailable, the defendants rely upon the affidavits of Reuben Broaddus and T. N. Wise. Broaddus states in substance, that he knew the plaintiff as far back as 1842, and that he then and frequently afterwards complained of weakness and feebleness, and that his health was so frail that sometimes he was not able to perform hard labor; that what he knew upon the subject was not disclosed to the defendants until their attorney had commenced his argument to the jury.

Assume these statements to be true, they do not sustain the motion for a new trial; because,

1. If the testimony of Broaddus would have been important in aid of the defense, upon motion to the court, based upon the facts stated, the argument of the case would have been suspended, and Broaddus might have been sworn as a witness, and would have been allowed to give evidence to the jury before their retirement. But although the witness was present and defendants knew what he would prove, before the case had been given to the jury, they did not offer to introduce him. (*Higden* v. *Higden*, 2 *A. K. Marshall*, 43.)

2. Because the defendants, from the facts in the record, are convicted of negligence with respect to the preparation of their defense. It appears that at

*Margin right:*

FLEET AND
SEMPLE
*vs.*
HOLLENKEMP.

1. Where a party discovers testimony, even after the argument has commenced, and it can then be given, it is his duty to ask that it be heard, and' the duty of the court to admit it; if the party fail to offer it, it is no ground for a new trial. (2 *A. K. Marshall*, 43.)

the term preceding that during which the trial took place, the cause had been fully investigated before a jury, and the evidence heard, but the jury failing to agree, there was a mis-trial. The same evidence for plaintiff was no doubt then given to the jury, upon which he relied in the final trial; and the defendants had ample time, by reasonable inquiry, to have procured witnesses to establish the fact, of the importance of which they could not have been ignorant, if it could have been done—to-wit: that the ill health of the plaintiff had been of long standing, and not of recent origin. As bearing upon the question of the amount of damages to be given by the jury, the plaintiff, on the final trial, and as is supposed at the previous mis-trial, introduced proof to the effect that his general health was good; the defendants could and should, therefore, by the exercise of due and proper diligence, have procured countervailing evidence, if the fact existed, to show that plaintiff's bad health had previously existed; and that, it was not, therefore, caused by the drugs prepared for him by them or their clerk. The present ill health of the plaintiff, and its true cause, was the main point of fact in issue and contested before the jury, and the defendants staked the case upon their preparation, as made, and cannot be indulged with a new trial, because they may have ascertained during the trial that they could have strengthened their proof upon the issue in question, and especially when their witness was present before the argument to the jury was closed, and they might have had the benefit of his testimony upon application to the court. (*Chambers* v. *Chambers'* administrator, 2 *A. K. Marshall*, 349; *Wells* v. *Phelps*, 4 *Bibb*, 563.)

The affidavit of Dr. Wise does not give any material strength to the demand for a new trial. He merely states that he had visited the plaintiff professionally, since he had taken the compound prepared for him at the drug store of the defendants, and that his opinion was, that plaintiff's disease was an affec-

tion of the mucous membrane of the stomach and bowels, and not connected with the kidneys and bladder, or urinary organs. It is not perceived how Dr. Wise's statement could have produced a different verdict of the jury, necessarily; for the disease attributed to the plaintiff by Dr. Wise may well have been produced by the cantharides taken by him. The proof in the cause of its effects, and generally of the symptoms and effects exhibited by the plaintiff, as consequent upon the dose administered to him, would make the conclusion reasonable that his disease, as described by Dr. Wise, was thereby produced.

The defendants have not shown that Dr. Wise's testimony, had it gone to the jury upon the trial, either could or ought to have induced the jury to have rendered a more favorable verdict for defendants. (*Barrett* v. *Belshe*, 4 *Bibb*, 349.)

So far, therefore, as the motion for a new trial was predicated upon the affidavits of Broaddus and Wise, and the accompanying affidavits of the defendants, it could not have been properly sustained.

The next question presented, is, that the court should have sustained the motion for a new trial because the damages are excessive.

There is no fixed and certain criterion of damages for personal injuries, similar to those sustained by the plaintiff in this action. The question as to their amount is within the sound and reasonable discretion of the jury. The damages given may be more or less exemplary, or otherwise, as the circumstances of aggravation or extenuation, characterizing each particular case, may reasonably require.

There is a class of personal injuries, such as slander, libel, malicious prosecution, and including injuries to a person's health, business, and property, caused by indirect means, unattended with force, and for redress of which the remedy is by an action upon the case, and not by the action of trespass, for which a jury may give exemplary damages, as well where the action is in case as when it is in trespass; and wheth-

FLEET AND
SEMPLE
*vs.*
HOLLENKEMP.

negligence. (10
*Con. Rep.* 388;
15 *Ib.* 235; *Har-
rington's Rep.*
483.) In this
case the dam-
ages not deem-
ed excessive.

er exemplary damages should or should not be given does not depend upon the form of action so much as upon the nature and extent of the injury done, and the manner in which it was inflicted, whether by negligence, wantonness, or with or without malice. (*Merrells* v. *The Tariff Manufacturing Company,* 10 *Con. Rep.* 388 ; *Linsley* v. *Bushnell,* 15 *Con. Rep.* 235 ; *Allen McLane* v. *Jesse Sharpe, and others, Harrington's Rep.* 483.)

In the present case the damages given by the jury cannot be regarded as so excessive as to authorize this court to reverse the judgment on that ground. From the evidence in the cause, the jury had the opportunity and the right to decide the question of fact as to the extent of the injury done to the plaintiff's health, and if the injury was considerable, protracted, or permanent, the amount of the damages found by them was, if even sufficient, not excessive, and the verdict and judgment ought not, on that ground, to be disturbed.

But it is urged that the circuit judge improperly instructed the jury upon the law of the case. Upon motion of the attorney for the plaintiff, the court gave the following instruction : No. 1. "If the jury " believe from the evidence, that the defendants, Fleet " and Semple, were the proprietors of the drug store " in the city of Covington, at which the prescription, " alluded to in the evidence, made for the plaintiff " by Dr. Whitehouse, was compounded, and that said " *prescription,* as put up at said drug store, contained " Spanish flies or cantharides, and that the plaintiff, " in consequence of taking a part of it, was made " sick or injured thereby, they ought to find for the " plaintiff, even although they may believe that de- " fendants were ignorant of the fact that said prescription did contain said ingredient." Although the words of this instruction are injudiciously selected and arranged, yet, if its meaning is not misapprehended, it embraces in its terms a proposition of law pertinent to the case and applicable to the facts presented to the jury by the evidence. Of course the

attorney who wrote the instruction, and the judge who gave it, in using the expressions as to the "prescription's containing Spanish flies," and as to the plaintiff's having taken a portion of the prescription, &c., have reference to the mixture compounded at the drug store, and not to the written prescription of the physician, intended as a direction to the druggists as to the drugs to be compounded. If the plaintiff sent a prescription to the defendants' drug store, containing directions that snake root and Peruvian bark, in certain quantities should be furnished, ground into powder and mixed; then, if the defendants, or any employee of theirs in their drug store, in filling such prescription, whether ignorantly or by design, whether with or without the knowledge of the defendants, they being proprietors, did intermix the poisonous drug cantharides, or Spanish flies, with the bark and snake root, and if, in taking this preparation or mixture as medicine, the plaintiff was injured, the defendants being owners of the drug store, are legally responsible in damages to the plaintiff for the accident, if it was one, and for the outrage if it was designed.

It is a well established rule and principle of law, that a vendor of provisions for domestic use is *bound to know* that they are *sound* and *wholesome*, at *his peril* —(*Van Bracklin* v. *Fonda,* 12 *Johnson's Rep.* 468.) It is a sound and elementary principle of law, that in contracts for the sale of provisions, the party, by implication, who sells them, undertakes that they are sound and wholesome—(3 *Black. Com.* 165.)

In 3d Blackstone's Comméntaries, by Chitty, corner page 91, it is laid down in general terms—"Injuries " affecting a man's health, are where by any unwhole- " some practices of another, a man sustains any ap- " parent damage in his vigor or constitution, as by " selling him bad provisions or wine ; by the exercise " of a noisome trade, or by the neglect or unskillful " management of a physician, surgeon, or *apothecary* " —these are wrongs or injuries unaccompanied by

4. Vendors of provisions for domestic use are bound to know that they are sound at their peril. (12 *Johnson,* 468; 3 *Black.* 165; 3 *Chit. Black.* 91.)

FLEET AND
SEMPLE
vs.
HOLLENKEMP.

5. And it is the duty of druggists to know the properties of the medicine which they vend, and to employ such persons as are capable of discriminating and compounding according to prescription, and if they depart from the prescription, or ignorantly introduce other and poisonous drugs, they are responsible for the consequences to the party injured; and cannot escape responsibility by proof that they had been extraordinarily careful in general.

"force, for which there is a remedy in damages by a "special action on the case."

Now, if a man who sells fruits, wines, and provisions, is bound at his peril, that what he sells for the consumption of others shall be good and wholesome, it may be asked, emphatically, is there any sound reason why this conservative principle of law should not apply with equal if not with greater force to vendors of drugs from a drug store, containing, as from usage may be presumed, a great variety of vegetable and mineral substances of poisonous properties, which if taken as medicine will destroy health and life, and the appearance and qualities of which are known to but few, except they be chemists, druggists, or physicians. The purchasers of wines and provisions, by sight, smell, and taste, may be able, without incurring any material injury, to detect their bad and unwholesome qualities; but many are wholly unable, by the taste or appearance of many drugs, to distinguish those which are poisonous from others which are innoxious, so close is their resemblance to each other; purchasers have, therefore, to trust the druggist. It is upon his skill and prudence they must rely. It is, therefore, incumbent upon him that he understands his business. It is his duty to know the properties of his drugs, and to be able to distinguish them from each other. It is his duty so to qualify himself, or to employ those that are so qualified, to attend to the business of compounding and vending medicines and drugs, as that one drug may not be sold for another; and so that, when a prescription is presented to be made up, the proper medicines, and none other, be used in mixing and compounding it. As applicable to the owners of drug stores, or persons engaged in vending drugs and medicines by retail, the legal maxim should be reversed. Instead of *caveat emptor*, it should be *caveat vendor*. That is to say, let him be certain that he does not sell to a purchaser or send to a patient one drug for another, as arsenic for calomel, cantharides

for or mixed with snake root and Peruvian bark, or even one innocent drug, calculated to produce a certain effect, in place of another sent for and designed to produce a different effect. If he does these things, he cannot escape civil responsibility, upon the alleged pretexts that it was an *accidental* or an innocent mistake ; that he had been very careful and particular, and had used *extraordinary care and diligence* in preparing or compounding the medicines as required, &c. Such excuses will not avail him, and he will be liable, at the suit of the party injured, for damages at the discretion of a jury.

The defendants' attorney moved the court to instruct the jury as follows :

1. If from the evidence the jury believe that the defendants, in preparing the prescription, used due and reasonable skill, care, and diligence, they must find for defendants. 2. If from the evidence the jury believe that the defendants, in putting up the prescription, used extraordinary or unusual care, they must find for the defendants.

These instructions were not given, but properly refused by the court. The rule as to the degree of care and diligence necessary to be used in certain cases to exempt a party from liability, and as to the extent or degree of negligence necessary to devolve civil responsibility upon the party guilty thereof, do not apply to the present and similar cases. It is absurd to speak of degrees of diligence and of negligence as excusing or not excusing, or as settling the question of liability or no liability, in a case where the vendor of drugs, being required to compound innocent medicines, runs them through a mill in which he knew a poisonous drug had shortly before been ground. If mistake or accident could excuse the sending of a medicine different from that applied for, which we do not admit and cannot readily conceive, there could have been neither mistake nor accident in this case, because the fact of the previous use of the mill was known to the vendors, and they are abso-

6. The rules in regard to the degree of diligence necessary to exempt a party from responsibility, in certain cases, do not apply to a case where a druggist is required to compound certain medicines, and in doing so, he run them through a mill in which he knew poisonous drugs had been ground, and failed to cleanse it properly so as to prevent the evil.

lutely responsible for a consequence which that knowledge enabled them and made it their duty to avoid. Even accidents or mistakes should not occur in a business of this nature, and they cannot ordinarily occur without there has been such a degree of culpable if not wanton and criminal carelessness and neglect, as must devolve upon the party unavoidable and commensurate responsibility. We were asked by the attorneys in their arguments, with some emphasis, if druggists are to be, in legal estimation, regarded as 'insurers?' The answer is, that we see no good reason why a vendor of drugs should, in his business, be entitled to a relaxation of the rule which applies to vendors of provisions—which is, that the vendor undertakes and insures that the article is wholesome. Sound public policy in relation to the preservation of the health and even of the lives of the people, would seem to require that this rule should have a rigid and inflexible application to cases similar to the one under consideration. As the responsibility of the defendants in this case does not depend upon the degree of care or diligence or negligence used by them, but upon the naked fact, that when requested to compound a medicine for plaintiff to be composed *alone* of snake root and Peruvian bark, the preparation sent to plaintiff contained also the poisonous drug cantharides, which had been recently ground in the same mill, the taking of which caused him great pain, suffering, and sickness, if it has not permanently injured his health. The instructions asked by the defendants were properly refused.

The instruction upon the subject of damages, given by the court in lieu of the one asked by plaintiff's attorney, though framed and expressed in language not so well chosen and adapted to present the proposition of law therein intended to be set forth, as other language would have been, yet, as understood, the instruction is in substantial conformity to the views of this court as expressed in this opinion. Wherefore the judgment of the circuit court is affirmed.

*Harlan & Callender*, for appellants ; *Moar & Spill-*
*man*, for appellee.