87 P.3d 910

**Paula KAOPUIKI, as Guardian for William P. Enos, Plaintiff–Appellant,**

v.

**Sonia Esther KEALOHA, and Doreen Kusunoki, Co–Personal Representatives of The Estate of Russell Kalani Opio Kealoha, and Fletcher Pacific Construction Company, Ltd., Defendants–Appellees, and John Does 1–10, Jane Does 1–10, Doe Partnerships 1–10, Doe Corporations 1–10, Doe Governmental Entities 1–10, Defendants.**

No. 24203.

Intermediate Court of Appeals of Hawai'i.

Oct. 10, 2003.

Certiorari Granted Nov. 17, 2003.

Certiorari Dismissed April 8, 2004.

Roy Y. Yempuku, Janice P. Kim, Honolulu, and David Allan Feller, on the briefs, for plaintiff-appellant.

James T. Wong and R. Laree McGuire, on the briefs, Honolulu, for defendants-appellees, Sonia Esther Kealoha and Doreen Kusunoki, Co–Personal Representatives of the Estate of Russell Kalani Opio Kealoha.

Stephen B. MacDonald, on the briefs, for defendant-appellee, Fletcher Pacific Construction Company, Ltd.

BURNS, C.J., and FOLEY, J.; with LIM, J., Concurring In Part and Dissenting in Part.

### Opinion of the Court by BURNS, C.J.

Plaintiff–Appellant Paula Kaopuiki (Kaopuiki) is the mother of William P. Enos (Enos), born on May 10, 1975. By a January 8, 1993 court order entered pursuant to Hawai'i Revised Statutes (HRS) § 551-2 (1993),

Kaopuiki was appointed *prochein ami* or next friend of Enos "for the purpose of prosecuting a claim for damages" in this case. Enos was then a minor and an incapacitated person. In her "next friend" capacity, we will refer to Kaopuiki as "Kaopuiki/Enos."

Kaopuiki/Enos filed suit against Defendants–Appellees Sonia Esther Kealoha (Sonia) and Doreen Kusunoki (Doreen) as Co–Personal Representatives of the Estate of Russell Kalani Opio Kealoha (collectively the Kealoha Estate) on January 8, 1993. In an amended complaint filed on February 16, 1995, Kaopuiki/Enos added Defendant–Appellee Fletcher Pacific Construction Company, Ltd. (Fletcher Pacific).[1]

Kaopuiki/Enos appeals from (1) the March 5, 1996 "Order Granting Motion for Summary Judgment of Defendant Fletcher Pacific Construction Co., Ltd."; (2) the December 16, 1999 "Order Granting Defendants Sonia Esther Kealoha and Doreen Kusunoki, Co–Personal Representatives of the Estate of Russell Kalani Opio Kealoha's Motion for Summary Judgment on the Plaintiff's Claim for Punitive Damages and Order Denying William P. Enos' Motion for Partial Summary Judgment As to Liability for Punitive Damages Against the Estate of Russell Kalani Opio Kealoha," in favor of the Kealoha Estate on the issue of punitive damages; (3) the June 1, 2000 Judgment ordering the Kealoha Estate to pay Kaopuiki/Enos $5,000; and (4) the August 15, 2000 "Order Denying Plaintiff's Motion for a New Trial."[2]

Although Rule 28 of the Hawai'i Rules of Appellate Procedure (HRAP) (2002) clearly provides what must be stated in an opening brief, even the Second Amended Opening Brief (Opening Brief) filed by Kaopuiki/Enos substantially fails to comply with the requirements set forth in HRAP Rule 28(b)(3) and (4)[3].

---

**1.** At oral argument, counsel advised the court that the new name for Defendant–Appellee Fletcher Pacific Construction Company, Ltd., is Dick Pacific Construction Company, Ltd.

**2.** Judge Allene R. Suemori entered (1) above; Judge Virginia L. Crandall entered (2), (3), and (4) above.

**3.** Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b) (2002) states, in relevant part, as follows:

> Within 40 days after the filing of the record on appeal, the appellant shall file an opening brief, containing the following sections ...:
> ....

Kaopuiki/Enos asserts the following points on appeal.

1. The court reversibly erred when it allowed the jury to base its verdict on the argument that Enos suffered from "a pre-existing condition[.]"

As to point 1, Kaopuiki/Enos asserts the following additional sub-points: (a) the court refused to take judicial notice of the alleged fact that, in a prior criminal proceeding, "the court determined that [Enos'] brain damage as a result of [the automobile] collision had rendered [Enos] unable to stand trial"; (b) the court allowed Dr. Robert Marvit "to testify, which evidence provided no actual evidence, but rather served to confuse the jury"; (c) the Kealoha Estate

> maintained a strategy throughout trial that [Enos] was suffering from a brain injury prior to the auto collision. During trial, [the Kealoha Estate] was allowed, over objection via motion *in limine,* to present character evidence concerning [Enos], a discussion of his relatively poor scholastic achievement and his truancy. [Kaopuiki/Enos] objected to this evidence, which was denied.

> [The Kealoha Estate] then had Dr. Marvit testify that, although he did not know the source of [Enos'] injury, he did not believe it was the collision. The lack of scientific or other reasonable basis for that testimony ... should have led the trial court to exclude that witness.

> The innuendo resulting from these presentations lead the jury to consider that [Enos'] brain injury was a pre-existing condition for which [the Kealoha Estate] was not responsible. This conclusion was

directly transmitted to the court in Communication No. 2 to the court: "Does Legal Cause encompass any cause, directly or indirectly, which may have exacerbated a pre-existing condition?["]

> The court had already determined that there was no pre-existing condition in the case, and so denied [the Kealoha Estate's] requested instruction to that effect.[4] In response to the jury's communication, however, the court did not instruct them that no pre-existing condition had been proven, and so should not be considered.

(Footnote added, record references omitted); and (d) the court's instruction

> on causation, if anything, made this situation worse. By failing to properly grant a directed verdict on causation, the court was forced to give a causation instruction, which instruction made it [Kaopuiki/Enos's] burden to prove that [Russell Kalani Opio Kealoha's] [admitted] negligence was "A legal cause" of injury to [Enos]. While the instruction in and of itself is proper, in combination with the other aspects of evidence and the court's failure to direct a verdict on causation, opened the door to the jury to consider if other causes for [Enos'] injuries may have existed, even though no evidence of such collateral causes was presented. Clearly, the jury's communications with the court show that they did just that.

2. The court reversibly erred when it denied the motion for a new trial filed by Kaopuiki/Enos.

3. The court reversibly erred when it granted summary judgment to Fletcher Pacific on the issue of liability.

(3) A concise statement of the case ..., with record references supporting each statement of fact....
(4) A concise statement of the points of error set forth in separately numbered paragraphs. Each point shall state: (i) the alleged error committed by the court or agency; (ii) where in the record the alleged error occurred; and (iii) where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency. Where applicable, each point shall also include the following:
(A) when the point involves the admission or rejection of evidence, a quotation of the

grounds urged for the objection and the full substance of the evidence admitted or rejected;
(B) when the point involves a jury instruction, a quotation of the instruction, given, refused, or modified, together with the objection urged at trial[.]

4. The transcript of the proceedings on March 15, 2000, indicates the court's decision regarding twelve proposed jury instructions. We deduce that this reference is to proposed jury instruction No. 7.3 regarding "pre-existing injury or condition[.]"

4. The court reversibly erred when it granted summary judgment to the Kealoha Estate on the issue of punitive damages.

We disagree with points 1, 2, and 3. We agree with point 4.

## BACKGROUND

On Saturday, September 19, 1992, Russell Kalani Opio Kealoha (Kealoha), age 31, worked a full day as a masonry foreman for Fletcher Pacific at Fletcher Pacific's construction project in Kapo-lei. Following the end of the work day at 3:30 in the afternoon, Kealoha met with Fletcher Pacific's heavy equipment foreman Robert Kahana, Sr. (Kahana Sr.), and his son, Fletcher Pacific's employee Robert Kahana, Jr. (Kahana Jr.), for a *pau hana*[5] get-together at approximately 4:00 p.m. At the *pau hana* get-together, Kealoha and Kahana Sr. drank beer purchased by Kealoha after work, then drank beer purchased by Kahana Jr., and they talked about, among other things, matters related to the job. The get-together ended at around 7:00 p.m., and Kealoha was seen driving away from the area in the direction of his home in Wai-'anae in his 1992 Ford pick-up truck.

A little more than two hours later, at 9:15 p.m., as Kealoha proceeded home in the direction of Wai-'anae, his pick-up truck crossed over the center line of Farrington Highway and collided head-on with a 1979 Toyota Corolla driven by Clifford Pila, Jr. (Pila). In the crash, Kealoha died. His blood alcohol content was measured at 0.257. Pila and his passenger, Enos, suffered injuries in the accident. Allegedly, "Enos bit off a part of his tongue[,]" lacerated his lip, fractured his left foot, and suffered "abrasions to his face" and "serious psychiatric injuries[.]"

On January 8, 1993, Kaopuiki/Enos filed a complaint against the Kealoha Estate alleging negligence, gross negligence, and/or intent and seeking general, special and punitive damages, costs, attorney fees, and prejudgment interest. On February 16, 1995, Kaopuiki/Enos filed a first amended complaint adding Fletcher Pacific as a defendant.

On October 27, 1995, prior to trial, Fletcher Pacific moved for summary judgment on the first amended complaint. The court entered the requested summary judgment on March 5, 1996. On March 15, 1996, Kaopuiki/Enos moved for reconsideration of the March 5, 1996, summary judgment. This motion was denied on July 3, 1996.

On September 27, 1999, the Kealoha Estate moved for summary judgment on the issue of punitive damages. The court entered the requested summary judgment on December 16, 1999.

Prior to the commencement of a jury trial on February 25, 2000, the Kealoha Estate stipulated that Kealoha had been negligent.

After the presentation of evidence, Kaopuiki/Enos moved for a directed verdict. The court denied the motion.

The court instructed the jury, in relevant part, as follows:

In this case, defendant has admitted fault for the incident. The burden is still on plaintiff to prove that defendant's conduct was a legal cause of injury to plaintiff and to prove the nature and extent of any injuries suffered. Therefore, the only questions which you must decide are:

One, was defendant's conduct a legal cause of the injury to plaintiff?

And two, if so, what amount of damages, if any, is plaintiff entitled to as compensation for that injury[?]

. . . .

An act or omission is a legal cause of an injury or damage if it was a substantial factor in bringing about the injury or damage. One or more substantial factors, such as the conduct of more than one person, may operate separately or together to cause an injury or damage. In such a case, each may be a legal cause of the injury or damage.

. . . .

---

5. "Pau" is defined as "finished, ended, through, terminated, completed[.]" Mary K. Pukui & Samuel H. Elbert, Hawai'ian Dictionary 319 (1986).

"Hana" is defined as "[work], labor, job, employment, occupation[.]" *Id.* at 55.

If you find for plaintiff on the issue of legal cause, plaintiff is entitled to damages in such amount as in your judgment will fairly and adequately compensate him for the injuries which he suffered.

. . . .

Compensation must be reasonable. You may award only such damages as will fairly and reasonably compensate plaintiff for the injuries or damages legally caused by defendant's negligence.

In her closing argument to the jury, counsel for Kaopuiki/Enos stated, in relevant part, as follows:

And you heard the testimony of Mrs. Loretta Lukens who told you that in order to really do the best we can do for [Enos], he should be in a structured program and that program is in Kahi Mohala.

. . . So when you get to the questions on damages, the issue is $6,125,000 for special damages. That is just the cost of care, purely the cost of care.

The next category is general damages, which are things like pain and suffering and mental anguish. And I would submit to you, ladies and gentlemen, that a figure put in there should not be less than what it cost to give [Enos] some quality of life. And if it's six million, one two five, whatever, for what it has cost to keep him up to date and what it would cost him the rest of his life, then the general damages, what it's going to cost for the rest of his life short of giving him care, should be an equal amount.

The essence of the Kealoha Estate's defense was stated in the closing argument to the jury as follows:

So if [Enos] doesn't have this dementia, what does he have? Well, Dr. Marvit said he has something called a schizo-affective disorder. Schizo, he said, referred to the hallucinations he apparently has and the affective talks about the swings in mood that he has, but what he told you was that you don't get this from trauma to the head.

Remember too that [Enos] admitted to Dr. Compton that he had had hallucinations before the accident. . . .

. . . .

. . . Dr. Yoshimoto sees him February 1, 1993, for the express purpose of . . . re-evaluating him for every single injury that he claims he sustained in the car accident. And there's no—the only thing he complained of then was his jaw was clicking a little bit. No other problems.

. . . .

. . . [Mrs. Kaopuiki] didn't know what was going on in [Enos'] life at school when he was in eighth grade. She didn't know the extent of his problems in school in eighth grade.

She didn't know how many courses he took. He was failing the ninth grade. She didn't even know that he wasn't promoted to the tenth grade until that fall when she was told that he wasn't. And the important one, the important admission that she made was that she didn't even know what was going on in his life the year before the accident.

. . . .

We need not prove that this accident didn't cause the injury, but we have and by doing so, the plaintiff has not met their burden, but you see, if you decide that the accident was just as likely to cause his permanent mental condition as it is not likely to cause it, then it's equal and the plaintiff does not prevail.

The court submitted the following "Special Verdict Form" to the jury:

Question No. 1: Was the negligence of [Kealoha] a legal cause of injury to [Enos]? Answer "Yes" or "No" in the space provided below.

. . . .

If you [the jury] have answered Question No. 1, "Yes," then go on to answer Question No. 2. If you [the jury] have answered Question No. 1 "No," do not answer any further questions, but sign and date this document and call the Bailiff.

Question No. 2[:] What are the general and special damages of [Enos]?

Jury deliberations started on the afternoon of March 16, 2000. One of the questions the jury asked the court on March 17, 2000, in Communication No. 1 from the jury, was,

"Please clarify the full extent or give us parameters for legal cause (Question # 1)." The court responded by asking the jury to "[please] clarify your question." In Communication No. 2 from the jury, the jury asked, "Does legal cause encompass *any* cause, directly or indirectly, which may have exacerbated a pre-existing condition?" (Emphasis in original.) The court responded to the jury as follows: "The issue of legal cause in question # 1 of the verdict form is whether the negligence of the Defendant caused any injury to the Plaintiff. The nature and extent of injury, if any, are to be determined in question # 2 of the verdict form if you answered question # 1 yes." The jury reached its verdict on the afternoon of March 21, 2000.

On June 1, 2000, the court entered the judgment. On June 9, 2000, Kaopuiki/Enos moved for a new trial. After a hearing, the court denied the motion on August 15, 2000. On September 13, 2000, Kaopuiki/Enos filed a notice of appeal.

## DISCUSSION

### 1.

In the Opening Brief, Kaopuiki/Enos argues, in relevant part, as follows:

It was a primary defense tactic that [Enos] would be portrayed as having suffered from his psychiatric injuries prior to the motor vehicle collision. There was no evidence to support this theory, but the court, over objection, allowed [the Kealoha Estate] to make a presentation of Enos' childhood during the trial, *inter alia*, attempting to portray him as a poor student and suffering from "mental problems" prior to the accident.

Although the trial court allowed the presentation of such evidence, the court acknowledged that an argument based on a pre-existing condition, or apportionment of injuries to such a condition, was not supported by the evidence. The court refused to give [the Kealoha Estate's] requested jury instruction on such [a] theory.

Within the charge to the jury, however, the court did instruct the jury that there could be more than one cause of [Enos'] injuries: the instruction on legal causation given by the court specifically referred to multiple causes of injury.

The jury came back with a verdict for [Kaopuiki/Enos] in the amount of $5,000. During deliberations, the jury sent seven requests for guidance to the court, including instruction as to how to "apportion" damages for "pre-existing conditions." The court refused to clarify the law for the jury, or to instruct the jury that such issues were not present in the case, as it had previously concluded as a matter of law.

[Kaopuiki/Enos] filed a motion for NOV. and/or a new trial, the core arguments of which concerned the jury's obvious confusion as to the proper scope of its deliberations (and wrongful consideration of pre-existing conditions in calculating damages), and the failure of the jury to return a verdict consistent with the overwhelming weight of the evidence. That motion was denied.

(Record references omitted.)

We note that the question asked by the jury, "[does] legal cause encompass *any* cause, directly or indirectly, which may have exacerbated a pre-existing condition?" (emphasis in original), clearly does not support the above-quoted allegation by Kaopuiki/Enos that "[during] deliberations, the jury sent seven requests for guidance to the court, including instruction as to how to 'apportion' damages for 'pre-existing conditions.' "

We further note that the court's answer to the question asked by the jury, "[the] issue of legal cause in question # 1 of the verdict form is whether the negligence of the Defendant caused any injury to the Plaintiff[; and] [the] nature and extent of injury, if any, are to be determined in question # 2 of the verdict form if you answered question # 1 yes," clearly does not support the above-quoted allegation by Kaopuiki/Enos that "[the] court refused to clarify the law for the jury, or to instruct the jury that such issues were not present in the case[.]"

Kaopuiki/Enos states the relevant point on appeal as follows: "Whether the court erred in allowing the jury to base its verdict on the

argument that [Enos] suffered from a pre-existing condition causing his brain damage?"

### (a)

On March 8, 1995, in *State v. Enos,* Cr. No. 93–2430, Circuit Court of the First Circuit, State of Hawai'i, Judge James R. Aiona entered "Findings of Fact, Conclusions of Law and Order Granting Defendant's Motion to Dismiss Charge." The findings of fact stated, in relevant part, as follows:

5.... Dr. Compton noted that [Enos] suffered a severe head injury in an auto accident in September of 1992.

. . . .

9.... Dr. Stein ... indicated that [Enos] suffered from organic [brain] damage due to the September 1992 auto accident. Dr. Stein also indicated that [Enos'] brain damage was irreversible. Although Dr. Stein indicated that [Enos] was "minimally" fit to proceed, Dr. Stein related that [Enos] would have great difficulty assisting in his own defense.

10. Based upon [Enos'] mental disorder, the court finds that [Enos] is presently unfit to proceed. Moreover, the court finds that [Enos] may never be able to understand the proceedings against him and assist in his defense.

■ Kaopuiki/Enos contends that when, in the instant case, the court refused to take judicial notice that Enos' mental disorder was caused by the 1992 auto accident, the court violated a rule that "[a] court may, and shall, take judicial notice of facts which are established in prior proceedings[.]" We disagree. Assuming such is a rule, Nos. 5 and 9 above are not findings. They are statements of the evidence. No. 10 is a finding. If Nos. 5 and 9 above were findings, they are not essential to No. 10. In the 1995 criminal case, the cause of Enos' mental disorder was not relevant.

### (b)

■ Kaopuiki/Enos contends that "[the] lack of scientific or other reasonable basis for [Dr. Marvit's] testimony ... should have led the trial court to exclude that witness." We

disagree. Dr. Marvit testified, in relevant part, as follows:

A. My opinion is; [sic] based on everything I had before the examination, the examination and everything I've had since the examination, that I don't find sufficient evidence to indicate there was a brain injury of any kind of permanent nature that resulted from this accident.

. . . .

A.... You know, perhaps all psychiatric disorders have some kind of organic basis, whether it's genetic, biochemical or what have you. We're talking about an organic basis in this instance that would be as a result of a trauma specific to the brain, as I understand the question. And the distinction, therefore, is the picture, the clinical picture, the manifestations that I described are not consistent with the clinical course and the events documented in this instance.

Instead, it's not inconsistent with an individual who has a functional psychiatric disorder, and I've used in my report the term, ... "schizo-affective". Because from a perspective of description, describing what's happening irrespective of cause, the term "schizo-affective" which appears in the official nomenclature, ... "schizo" refers basically to the kind of symptoms of hallucinations, delusions or the schizophrenic-like phenomena that have been described.

The "affective" component is the mood disturbance, the sort of almost manic-depressive, where there's sort of an expansive hyperactivity to withdrawal. So if he manifests both of these kinds of things, then schizo-affective is kind of the default category that best encompasses the behavior from a psychiatric point of view, and this is not a disorder that comes from a head injury per se.

### (c)

Prior to trial, the court entered the following order:

IT IS HEREBY ORDERED that Plaintiff's Motion in Limine to Exclude Evidence of William P. Enos' Character filed 9/17/99 is granted as to allegations of mari-

juana use and references to the sexual harassment or sexual assault incident, denied as to academic performance and school records. The Court shall take under advisement the alleged use of "ice".

■ Kaopuiki/Enos contends that the court erred when the Kealoha Estate "was allowed, over [the] objection [via the motion *in limine,*] to present character evidence concerning [Enos], a discussion of his relatively poor scholastic achievement and his truancy." (Record citation omitted.) In light of the questions to be decided by the jury, we disagree.

■ Kaopuiki/Enos contends that the court determined that there was no pre-existing condition when it decided, over the objection of both parties, not to give its proposed Instruction No. 7.3 to the jury. That instruction states, in relevant part, as follows:

In determining the amount of damages, if any, to be awarded to plaintiff(s), you must determine whether plaintiff(s) had an injury or condition which existed prior to the *[insert date of the incident]* incident. If so, you must determine whether plaintiff(s) was/were fully recovered from the pre-existing injury or condition or whether the pre-existing injury or condition was latent at the time of the subject incident. A pre-existing injury or condition is latent if it was not causing pain, suffering or disability at the time of the subject incident.

. . . .

If you find that plaintiff(s) was/were not fully recovered and that the pre-existing injury or condition was not latent at the time of the subject incident, you should make an apportionment of damages by determining what portion of the damages is attributable to the pre-existing injury or condition and limit your award to the damages attributable to the injury caused by defendant(s).

The source of this instruction is *Montalvo v. Lapez,* 77 Hawai'i 282, 884 P.2d 345 (1994). Kaopuiki/Enos does not challenge the court's decision not to give this instruction. Kaopuiki/Enos contends that the court's decision not to give this instruction was, by itself,

without any related indication by the court, a decision that Enos had no pre-existing injury or condition and, therefore, all "damages" suffered by Enos were caused by the collision. We disagree. It was a decision that it was an all or nothing question and there was no apportionment issue for the jury. The question was whether the problem Enos suffered with his brain was a pre-existing condition or a condition caused by the collision.

■ Kaopuiki/Enos contends that "[Enos] suffered a brain injury in the accident and the jury did not compensate him for it." She fails to recognize that it was her burden to prove that (a) Enos "suffered a brain injury in the accident" and (b) the extent and value of that damage. It appears that the jury decided that Kaopuiki/Enos failed her burden. Kaopuiki/Enos presented evidence that the problems Enos suffered with his brain were caused by the collision. The Kealoha Estate presented evidence that the problems Enos suffered with his brain were not caused by the collision. Dr. Marvit testified, in relevant part, as follows:

A.. . . .

. . . [If] an individual has fluctuating; that is, coming and going areas of lucidity where they can do all right and other areas where they're terribly dysfunctional and this seems to cycle, then it would seem in my opinion more logical to look at what's known as a functional disorder rather than one that's based on an anatomical disruption founded on trauma.

In addition, the manifestations of dementia usually are reflected in an ongoing regressive dependency. That is, people with dementia don't necessarily say they like to cruise, or get along or what have you. [Enos] displays in the records psychiatrically, Queen's [Medical Center's] records, mood disorder, where he can be angry, expansive, destructive, he can also be depressed, as well as having the problem of hearing voices and seeing things.

If an individual is having such a wide range of disturbances from hallucinations, auditory and visual, mood disturbances from hyper-agitation to withdrawal, along with inappropriate behavior and difficulty in being able to be consistent, it speaks to

a psychiatric disorder rather than an organic one.

. . . .

Q. . . . Doctor, could you just explain to the jury the difference between organic disease as opposed to psychiatric disorder?

A. I said that the distinction is artificial, at best. You know, perhaps all psychiatric disorders have some kind of organic basis, whether it's genetic, biochemical or what have you. We're talking about an organic basis in this instance that would be as a result of a trauma specific to the brain, as I understand the question. And the distinction, therefore, is the picture, the clinical picture, the manifestations that I described are not consistent with the clinical course and the events documented in this instance.

Instead, it's not inconsistent with an individual who has a functional psychiatric disorder, and I've used in my report the term, . . . "schizo-affective". . . . "[Schizo]" refers basically to the kind of symptoms of hallucinations, delusions or the schizophrenic-like phenomena that have been described.

The "affective" component is the mood disturbance, the sort of almost manic-depressive, where there's sort of an expansive hyperactivity to withdrawal. So if he manifests both of these kinds of things, then schizo-affective is kind of the default category that best encompasses the behavior from a psychiatric point of view, and this is not a disorder that comes from a head injury per se.

(d)

Kaopuiki/Enos contends that the court erred when it denied her motion for a directed verdict on causation. The motion was stated as follows:

[COUNSEL FOR KAOPUIKI/ENOS]: At this time, we move for a directed verdict, judgment as a matter of law on the issue of causation. That the causation instruction is that defendant's negligence being a legal cause of an injury to [Enos]. In this case, there has been undisputed testimony that [Enos] did suffer a broken fractured [sic] foot as a result of this impact.

. . . There has been no dispute as to that injury, no dispute as to the causation of that injury.

And therefore, on the issue of causation and injury to [Enos], [Kaopuiki/Enos] should prevail because there is absolutely no information on which the jury could find that the negligence of the defendant was not a legal cause of an injury to [Enos].

If Kaopuiki/Enos wanted the directed verdict for only the broken foot suffered by Enos, her point may have been valid. Obviously, however, she wanted it for more than that. Moreover, the jury decided that the negligence of Kealoha was a legal cause of injury to Enos so Kaopuiki/Enos has no basis for complaining about the lack of a directed verdict on the issue.

The allegation by Kaopuiki/Enos that the court "opened the door to the jury to consider if other causes for [Enos'] injuries may have existed, even though no evidence of such collateral causes was presented" erroneously assumes that Enos' problems with his brain, pre-accident, was the result of an injury. It also improperly seeks to impose a burden on the Kealoha Estate.

2.

The Hawai'i Supreme Court has often stated, " 'Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion.' " *Kawamata Farms, Inc. v. United Agri Products,* 86 Hawai'i 214, 251, 948 P.2d 1055, 1092 (1997) (quoting *State v. United States Steel Corp.,* 82 Hawai'i 32, 54, 919 P.2d 294, 316 (1996) (citations and internal quotation marks omitted)). " 'A . . . court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.' " *Abastillas v. Kekona,* 87 Hawai'i 446, 449, 958 P.2d 1136, 1139 (1998) (quoting *Kawamata Farms,* 86 Hawai'i at 241, 948 P.2d at 1082).

Kaopuiki/Enos contends that the court abused its discretion in denying his motion for a new trial because (a) the verdict

contradicts the weight of the evidence, (b) the verdict was produced by juror confusion, and/or (c) the jury awarded inadequate damages. Upon a review of the record, we disagree.

In the Opening Brief, Kaopuiki/Enos reasons as follows: (1) the testimony of several witnesses established causation and $6,000,000 damages by a preponderance of the evidence; (2) the jury returned a damage award of $5,000; (3) an award of $5,000 is *de minimis* when compared to $6,000,000; (4) therefore the jury disregarded the clear weight of the evidence when they awarded $5,000 in this case. This reasoning fails to acknowledge evidence supporting the jury's verdict in this case.

### 3.

The circuit court's grant or denial of summary judgment is reviewed *de novo* under the same standard applied by the circuit court. *Roxas v. Marcos,* 89 Hawai'i 91, 116, 969 P.2d 1209, 1234 (1998) (citation omitted); *Amfac, Inc. v. Waikiki Beachcomber Investment Co.,* 74 Haw. 85, 104, 839 P.2d 10, 22 (1992) (citation omitted). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Roxas,* 89 Hawai'i at 116, 969 P.2d at 1234 (citation omitted); *see also* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.,* 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted). In a motion for summary judgment, the movant has the burden of demonstrating the absence of any issue of material fact to the court ruling on the motion. *Gump v. Walmart Stores, Inc.,* 93 Hawai'i 428, 438, 5 P.3d 418, 428 (App.1999), overruled on other grounds by *Gump v. Walmart Stores, Inc.,* 93 Hawai'i 417, 5 P.3d 407 (2000) (citation omitted).

In *Wong–Leong v. Hawai'ian Independent Refinery, Inc.,* 76 Hawai'i 433, 879 P.2d 538 (1994), the Hawai'i Supreme Court concluded that an employer may be held liable for the acts of its employees according to the following theories of liability: (a) "negligent failure to control an employee" and (b) *respondeat superior.*

In examining the theory of "negligent failure to control an employee[,]" the Hawai'i Supreme Court adopted the principles set forth in RESTATEMENT (SECOND) OF TORTS § 317 (1965). *Wong–Leong,* 76 Hawai'i at 444, 879 P.2d at 549. Under RESTATEMENT (SECOND) OF TORTS § 317,

[a] master is under a duty to exercise reasonable care so [as] to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if,

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant,

. . .

..., and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

*Id.,* 879 P.2d at 549. In its motion for summary judgment, Fletcher Pacific argued that the official comments accompanying RESTATEMENT (SECOND) OF TORTS § 317 require employers to police only the premises under their control. Fletcher Pacific alleged that "the consumption of alcohol occurred off [Fletcher Pacific's] premises."

In *Wong–Leong,* the Hawai'i Supreme Court noted that recovery under *respondeat superior* requires (1) employee negligence (2) within the scope of the employee's employment. *Id.* at 438, 879 P.2d at 543 (citation omitted). In defining the scope of an employee's employment, the supreme court reiterated its approval of RESTATEMENT (SECOND) OF AGENCY § 228 (1958):

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits; [and]

(c) it is actuated, at least in part, by a purpose to serve the master[.]

*Id.*, 879 P.2d at 543 (brackets in original). In clarifying the scope of employment analysis, the Hawai'i Supreme Court in *Wong–Leong* stated that the applicable test centers around whether the employee's conduct was related to the employment enterprise or if the enterprise derived any benefit from the employee's activity. *Id.* at 441, 879 P.2d at 546 (citations omitted).

In the Opening Brief, Kaopuiki/Enos states, in relevant part, as follows:

[On September 19, 1992], Kealoha and [Kahana Sr.] were having discussions at the end of the work day about future work, inter alia, planning for future concrete pours at Fletcher Pacific's [Kapo-lei] ... construction site. The content of these discussions was undisputed by Fletcher Pacific.

The workers were on a stretch of land immediately adjacent to Fletcher Pacific's work office on the site, where the workers parked while on the job, and which was subsequently developed into a part of the project. There was considerable dispute between the parties as to exactly where the drinking had occurred, and what the status of that area was vis a vis Fletcher Pacific's work at the [Kapo-lei] site: Fletcher Pacific claimed that the drinking occurred on a road next to, but not a part of, it's [sic] area of control at the [Kapo-lei] construction [site]. Other evidence, including standard employee procedures, the construction contract itself, and security records from the site, suggested that the drinking had occurred in the area generally controlled and/or used by Fletcher Pacific and it's [sic] employees.

... Fletcher Pacific was aware of employee drinking in this manner.

(Record references omitted.)

In other words, Kaopuiki/Enos contends that summary judgment in favor of Fletcher Pacific was not authorized because there is evidence in the record that (1) Kealoha's drinking took place in an area that Fletcher Pacific possessed, controlled, or was responsible for on the day in question and (2) Kealoha and another Fletcher Pacific foreman, Kahana Sr., planned for future work while consuming their *pau hana* drinks on September 19, 1992.

In its Answering Brief, Fletcher Pacific responded, in relevant part, as follows:

Kealoha was employed by [Fletcher Pacific]. On the day of the accident [September 19, 1992], Kealoha worked at [Fletcher Pacific's] ... construction project in [Kapo-lei]. When they came to work that morning at the project, [Fletcher Pacific] employees parked their vehicles in [Fletcher Pacific's] employee parking lot. After finishing work, Kealoha drove his pick-up truck out of the [Fletcher Pacific] parking lot to go buy some beer. Kealoha then returned to [Kapo-lei] and parked his vehicle away off the [Fletcher Pacific] construction site on a dirt road between the office and the work site of Nordic Construction [Company] (another general contractor working on a construction project in [Kapo-lei]). At that point, Kealoha was joined by two other [Fletcher Pacific] employees: [Kahana Sr.] and [Kahana Jr.]. Kahana Sr.'s Ford pick-up truck had likewise been moved after work from the [Fletcher Pacific] parking area to the dirt road adjacent to Nordic Construction's work site.

While sitting in their vehicles on the dirt road, Kealoha and [Kahana Sr.] started consuming the beer which Kealoha had purchased while all three men talked. The three [Fletcher Pacific] employees were aware that company policy prohibiting [sic] drinking alcohol on the job and drinking alcohol on the premises (which they understood to mean on [Fletcher Pacific's] property). They knew that [Fletcher Pacific] prohibited "pau hana" drinking on its property. They chose the dirt road for their drinking because it was not on [Fletcher Pacific's] property. At approximately 7:00 p.m., the get-together broke

up. The accident in question happened 3 1/2 hours later.

(Record references and footnotes omitted.)

The following is a general, not-to-scale map showing the relevant areas in relation to each other:

```
+-------------------------------+ +-------------------------------+
| Fenced area where Fletcher | | Area where Nordic Construction|
| Pacific was constructing | | was constructing |
| Kapo-lei Office Building | MAUKA| James Campbell Building ——— |
+-------------------------------+(Mountain)+-----------------------------+

—— DEAD END (Wai-'anae) Dirt Road EXIT (Diamond Head)

+-------------------------------+ *** (Area of drinking) ***
| Fenced area for Fletcher | MAKAI +-------------------------------+
| Pacific's storage yard and |(Ocean)| Nordic Construction's |
| trailer office | | trailer office |
+-------------------------------+ +-------------------------------+

 ACCESS +-------------------------------+
 | Fenced parking area |
 +-------------------------------+
```

In his deposition, Kahana Jr. testified, in relevant part, as follows:

Q. Were you folks sitting on the dirt road or were you sitting off the dirt road?

A. Sitting in the back of our car.

. . . .

A. Just on the side of the road.

. . . .

Q. Your dad had a car?

A. Yes.

Q. What kind of car did he have?

A. He had an El Camino.

Q. And [Kealoha] had a truck?

A. Yes.

Q. Ford pickup, right?

A. Yes.

Q. You were driving a—

A. I wasn't driving that day.

. . . .

Q. . . . Do you recall what you folks were talking about?

A. Job.

. . . .

Q. Like what you guys got to do next?

A. Yes.

Q. Problems on the job?

A. Anything to do with the job.

Q. Was this something, you know, sitting around and talking about the job, not necessarily drinking, okay, but sitting around talking about the job. Is this something that went on regularly?

A. Yes.

Q. So you wouldn't—in other words, your dad [Kahana Sr.] and [Kealoha] might get together and talk about what they need to do and plan out things, outside of work?

A. Not really. They would only talk about what was the problems.

Q. What would be an example of what they would talk about?

A. About a slab of concrete, say, how can you make it faster, to save money, things like that.

Q. So this will be with respect to the [Kapo-lei] project?

A. Yes.

. . . .

Q. Okay. Did you see [Kealoha] drive away?

A. Yes.

Q. How was he driving?

A. Straight.

Q. Did he stop at the stop signs?

. . . .

A. Coming out of our job, out of a dead road, there is no stop signs.

Q. Where there are stop signs or stop lights.

A. He went [Mākaha] [towards Wai-'anae]. I went [Ka-imu-kī] [towards Diamond Head].[6]

. . . .

Q. So this dirt road that you folks were sitting near and your dad and [Kealoha] were drinking at, it forks, it becomes 2 roads. Is that what happened?

A. It was the site division of Fletcher Pacific on this side. I was working in that particular area. They was taking care of all the road and there was a dirt road coming off and there was an entrance where everybody does enter from, coming from town and anybody coming from [Wai-'anae], they enter through here and anybody coming through town enter through here.

. . . .

A. Fletcher Pacific did all the road in [Kapo-lei].

. . . .

Q. The road that you took, okay, to get off the project, at that time, was that a road that Fletcher Pacific had built?

A. I don't know if Fletcher Pacific did build it then.

. . . .

Q. The area where your father and [Kealoha] had parked that day, is that where people would park for the job?

A. Some people would park there.

On October 27, 1995, prior to trial, Fletcher Pacific moved for summary judgment on the first amended complaint. The court entered the requested summary judgment on March 5, 1996.

On March 15, 1996, Kaopuiki/Enos moved for reconsideration of the March 5, 1996 summary judgment. On March 22, 1996, in support of the motion for reconsideration, Kaopuiki/Enos filed a supplemental memorandum and "the security log relative to the date of the accident and the [Kapo-lei] Office Building[.]" The handwritten security log states, in relevant part, as follows:

600 came on premises took over shift.

workers still on premises Drinking off-Duty

area secured no problems on J.S.

8 employees listed in before page still on premises.

700 No problems.

7:11 worker in white el camino leaves premises

800 everybody still drinking in front.

900 all is secured

1000 all workers left all is secured

The contract governing Fletcher Pacific's development of the construction site was between Fletcher Pacific and The Estate of James Campbell and provided, in relevant part, as follows:

1.3 *JOB CONDITIONS (General):*

A. Contract Zone Limits: The Contract Zone Limits shown on the drawings indicate only in general the limits of the work involved. [Fletcher Pacific], however, is required to perform any and all necessary and incidental work which may fall outside of the these demarcation lines. However, [Fletcher Pacific] is expected to confine [its] normal construction activities within the Contract Zone Limits and not to spread [its] equipment and materials indiscriminately outside of the Limits.

. . . .

2.14 *ACCESS ROAD–WORK AREA, STORAGE AND PARKING:* Provide and be responsible for on-site access road and staging area for prosecution of the Work. Arrange storage and control parking and operations of workmen so as not to interfere with the Work or the Work of other Contractors. Keep the areas orderly, free of unnecessary hazards, and in a condition acceptable to the Architect and [The Estate of James Campbell]. Such staging areas shall be relocated as necessary as Work progresses. In the event on [sic] off-site access road is required to be constructed, provide for such work and restore access to its original state when no longer used.

Regardless of whether the dirt road was "on-site" or "off-site", the drinking did not

6. The map drawn by Robert Kahana, Jr. (Kahana Jr.) indicates that when they left the site where the drinking of beer had occurred, both Russell Kalani Opio Kealoha (Kealoha) and Kahana Jr.

proceeded on the dirt road in the direction of Wai-kīkī, that Kahana Jr. continued in the direction of Wai-kīkī, and that Kealoha turned in the *mauka* (mountain) direction.

occur on the dirt road and nothing in the contract allows Fletcher Pacific to control the area where the drinking occurred.

■ It was Fletcher Pacific's burden to show that there was no genuine issue as to any material fact and that Fletcher Pacific was entitled to judgment as a matter of law. *Gump,* 93 Hawai'i at 438, 5 P.3d at 428. More specifically, it was Fletcher Pacific's burden to establish, as a matter of law, the lack of evidence of one or more material elements of (1) *respondeat superior* and (2) negligent failure to control an employee. We conclude that Fletcher Pacific satisfied its burden. In light of the record, the only question is whether there was a genuine issue of material fact on Fletcher Pacific's allegation that it did not have "control" of the place of drinking. Fletcher Pacific provided evidence that the answer is no. Kaopuiki/Enos did not provide evidence that the answer is yes.

The security guard who wrote the security log was then employed by Merchant Security, Inc. (MSI), and MSI was hired by Fletcher Pacific and Nordic to "prevent any unauthorized entry ... after working hours, and if anyone remained in the areas or entered the areas after hours via the road or overland, then [MSI] was to enter such incident in the security logs[.]" There is no evidence that Fletcher Pacific was authorized to stop Fletcher Pacific's employees from drinking at the "place of drinking" noted above, or to instruct MSI to stop them.

### 4.

Kaopuiki/Enos challenges the grant of summary judgment in favor of the Kealoha Estate on the issue of punitive damages.

#### (a)

Kaopuiki/Enos contends that HRS § 663–4 authorizes the entry of a judgment for punitive damages regardless of whether the tortfeasor was alive when the judgment was entered. HRS § 663–4 (1993) states, "All rights of action arising out of physical injury

to the person ... shall survive, notwithstanding the death of the wrongdoer or any other persons who may be liable for damages for such physical injury or death."

HRS § 663–4 does not create any new rights regarding causes of action or damages. Similarly, it does not change the scope of punitive damages. HRS § 663–4 authorizes the entry of a judgment awarding punitive damages after the death of the tortfeasor if the law pertaining to "punitive damages" permits such an award.

#### (b)

In its motion for summary judgment, the Kealoha Estate argued that Kealoha's death in the accident precluded the subsequent award of punitive damages. The view of the majority of the States supports this position.[7] One author has stated, in relevant part, as follows:

> Exemplary damages are, broadly speaking, all civil damages that are not compensatory....
>
> ....
>
> ... The standards of conduct that trigger punitive awards range from malice (thirteen states), to simple gross negligence (five states), to something in between (twenty-five states).
>
> ....
>
> ... [There] are three distinct types of exemplary awards: statutory awards linked to behavior the state has decided is deserving of special punishment or deterrence; effectively unlimited punitive damages designed to punish or deter at the jury's discretion; and finally, common law exemplary damages limited to otherwise noncompensable injury, and including attorney's fees, court costs, as well as yet-uncompensable intangible harm.
>
> ....
>
> ... There is an almost complete consensus that, insofar as exemplary damages are punishment, they should not be levied against a deceased tortfeasor's estate. Insofar as exemplary liability is allowed, it is

---

7. *See,* Paul Minnich, Comment, *Punitive Damages and the Deceased Tortfeasor: Should Pennsylvania Courts Allow Punitive Damages to be Recovered from a Decedent's Estate?,* 98 Dick. L.Rev. 329, 333–35 (1994).

based on deterrent and compensatory justifications. Usually there must be a statute allowing the action to proceed against the deceased's estate.

Michael E. Lopez, Comment, *A Normative Theory of Nontortfeasor Liability and Taxonomy for Exemplary Damages*, 48 UCLA L.Rev. 1017 (2001) (footnotes omitted).

A good example of the majority view is *Lohr v. Byrd*, 522 So.2d 845 (Fla.1988), wherein the Supreme Court of Florida concluded that punitive damages cannot be assessed against the estate of a deceased tortfeasor because (1) the death of the person sought to be deterred prevents the accomplishment of deterrence, *id.* at 846–47, and (2) the innocent heirs of the deceased tortfeasor are punished rather than the tortfeasor. *Id.* at 846. In *Lohr*, the Supreme Court of Florida stated, in relevant part, as follows:

> [The] Fifth District Court of Appeal determined it was unreasonable to impose punitive damages in these circumstances. The court stated:
>
> > The punishment actually is inflicted upon his heirs. Separation of the "punitive" and "exemplary" aspects of such awards is unjustified because general deterrence logically depends upon the perception of punishment suffered by the wrongdoer. *When that punishment is diffused and unjustly inflicted upon the innocent, through a doctrine analogous to attainder, the deterrent effect is frustrated.* It is unrealistic to suppose that such awards deter other prospective tortfeasors, especially if the criminal laws fail to do so.
>
> *Byrd v. Lohr*, 488 So.2d 138, 139 (Fla. 5th DCA 1986) (emphasis added). We agree....
>
> First, it must be understood that the plaintiffs have already been compensated for their injuries and are now seeking damages *solely as punishment* for the decedent's misconduct. The plaintiff below, Byrd, recognizes the absence of anyone to punish, but justifies imposing punitive damages on a deterrence rationale, seeking our approval for the reasoning stated in *Stephens v. Rohde*, 478 So.2d 862, 863 (Fla. 1st DCA 1985), which says:

> > [I]f a potential tortfeasor realizes that his estate is liable to diminishment by punitive damages awards, as is his own purse while he lives, this provides an additional incentive to avoid tortuous conduct.
>
> Accepting this argument would result in our adopting a principle that would allow a decedent's widow and children to be placed on welfare for the decedent's wrong.

*Lohr*, 522 So.2d at 846–47.

The following are the relevant different possibilities:

1. The tortfeasor died during the incident.

2a. The tortfeasor died post-incident, prejudgment (as a result of the incident or not, intentionally or accidentally, self-caused or not).

2b. The tortfeasor died post-judgment, prejudgment on appeal (as a result of the incident or not, intentionally or accidentally, self-caused or not).

3. The tortfeasor is alive when the judgment on appeal is entered.

 The majority of jurisdictions in the United States will allow the imposition of punitive damages only in situations 2b and 3.

Hawai'i precedent on punitive damages is generally as follows:

> [Actions] of tort punitive damages may, under certain circumstances, be awarded in addition to such sum as the plaintiff may be found entitled to purely by way of compensation for his injuries and suffering. Such damages may be awarded in cases where the defendant "has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations"; or where there has been "some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences". In such cases a reckless indifference to the rights of others is equivalent to an intentional violation of them.

*Bright v. Quinn*, 20 Haw. 504, 511–12 (1911) (citations omitted).

Punitive or exemplary damages are generally defined as those damages assessed in addition to compensatory damages for the purpose of punishing the defendant for aggravated or outrageous misconduct and to deter the defendant and others from similar conduct in the future. D. Dobbs, *Handbook on the Law of Remedies*, § 3.9, at 204 (1973); *Restatement (Second) of Torts* § 908 (1979). Thus, the practice of awarding punitive damages is an exception to the general rule that damages are aimed at compensating the victim for his injuries. C. McCormick, *Handbook on the Law of Damages* § 77, at 275 (1935).

Since the purpose of punitive damages is not compensation of the plaintiff but rather punishment and deterrence, such damages are awarded only when the egregious nature of the defendant's conduct makes such a remedy appropriate. Thus, "[w]here the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award ... [punitive damages.]" W.P. Keeton, *Prosser & Keeton on the Law of Torts* § 2, at 9 (5th ed.1984); *Restatement (Second) of Torts* § 908, comment b. While the concepts of punishment or deterrence usually do not enter into tort law, in this "one rather anomalous respect ... the ideas underlying the criminal law have invaded the field of torts." *Prosser & Keeton, supra*, at 9.

. . . .

Despite its critics, the punitive damages doctrine has remained firmly established in the common law. "[T]he doctrine of punitive damages survives because it continues to serve the useful purposes of expressing society's disapproval of intolerable conduct and deterring such conduct where no other remedy would suffice." Mallor & Roberts, *Punitive Damages: Toward a Principled Approach*, 31 Hastings L.J. 639, 641 (1980). While "[a]n award of compensatory damages may be sufficient when injury has resulted from well-intentioned, but poorly advised behavior[,] when the defendant's conduct can be characterized as malicious, oppressive, or otherwise · outrageous, a stronger sanction is needed." *Id.*

at 648. Imposing punitive damages "effectively expresses to the defendant that such conduct will not be tolerated." *Id.* In such circumstances, utilizing "the civil law to shape social behavior is both logical and desirable." [*Tuttle v. Raymond*, 494 A.2d 1353, 1356 (Me.1985).]

. . . .

We described the nature and purpose of punitive damages in *Kang v. Harrington*, 59 Haw. 652, 660, 587 P.2d 285, 291 (1978), a case involving fraud, as follows:

> Punitive damages are in no way compensatory and are not available as a matter of right. An award of punitive damages is purely incidental to the cause of action. They may be awarded by the grace and gratuity of the law. They also act as a means of punishment to the wrongdoer and as an example and deterrent to others. (Citations omitted).

Similarly, in *Lauer v. Young Men's Christian Association of Honolulu*, 57 Haw. 390, 402, 557 P.2d 1334, 1342 (1976), we recognized that "[t]he award of punitive or exemplary damages constitutes an exception to the purely compensatory aspect of the damages concept as a means to right a wrong[,]" and that "[t]he deterrent or retributive effect of punitive damages must be placed squarely on the shoulders of the wrongdoer."

Thus, our decisions clearly reflect the dual purposes of punitive damages as punishing the defendant for aggravated misconduct and deterring the defendant and others from engaging in like conduct in the future. Our decisions further demonstrate that "something more" than mere commission of a tort is required to justify the imposition of punitive damages, as we have repeatedly emphasized that "[p]unitive damages may be awarded only in cases where the wrongdoer 'has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations'; or where there has been 'some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference

to consequences.'" *Kang v. Harrington,* 59 Haw. at 660–61, 587 P.2d at 291.

. . . .

We have repeatedly said that the fundamental purpose underlying an award of exemplary or punitive damages is to punish the wrongdoer and to deter him and others from committing similar wrongs and offenses in the future. *Kang v. Harrington, supra; Howell v. Associated Hotels, Ltd.,* 40 Haw. 492, 499 (1954). Thus, punitive damages are a form of punishment and can stigmatize the defendant in much the same way as a criminal conviction. It is because of the penal character of punitive damages that a standard of proof more akin to that required in criminal trials is appropriate, rather than the preponderance of the evidence standard generally employed in trials of civil actions. *Orkin Exterminating Co., Inc. v. Traina,* 486 N.E.2d 1019, 1022 (Ind.1986). A more stringent standard of proof will assure that punitive damages are properly awarded. For "although punitive damages serve an important function in our legal system, they can be onerous when loosely assessed." *Tuttle v. Raymond,* 494 A.2d 1353, 1363 (Me.1985); *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 723 P.2d 675 (1986).

Accordingly, for all punitive damage claims we adopt the clear and convincing standard of proof. The plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences. *Bright, supra.*

*Masaki v. General Motors Corp.,* 71 Haw. 1, 6–17, 780 P.2d 566, 570–75 (1989).

Succinctly stated,

[the] proper measure of punitive damages is (1) the degree of intentional, willful, wanton, oppressive, malicious or grossly

negligent conduct that formed the basis for [the] prior award of damages against [the tortfeasor] and (2) the amount of money required to punish [the tortfeasor] considering [his or her] financial condition.

Instruction No. 8.12, Hawai'i Civil Jury Instructions, 1999 edition;[8] *Kang,* 59 Haw. at 660–61, 587 P.2d at 291.

It is important to note, however, that the above definitions and descriptions of the purposes and measures of punitive damages all fail to include the fact that "facilitating payment of a plaintiff's attorney's fees is one of the purposes of punitive damages[.]" *Lee v. Aiu,* 85 Hawai'i 19, 35, 936 P.2d 655, 671 (1997).

From the above, we conclude that the purposes of entering a judgment for punitive damages are as follows:

1. To punish the tortfeasor by subjecting some of the tortfeasor's income and estate to the judgment.

2. To stigmatize the tortfeasor in much the same way as a criminal conviction.

3. To "facilitate payment" of the attorney fees incurred by the victim(s).

4. To deter the tortfeasor from similar conduct in the future.

5. To deter others from similar conduct in the future.

As noted above, when the Supreme Court of Florida in *Lohr* agreed with the conclusion that a judgment for punitive damages could not be entered against a deceased tortfeasor, it stated the following four reasons as the basis for its decision: (a) "the absence of anyone to punish"; (b) "[it] is unrealistic to suppose that such [punitive damage] awards deter other prospective tortfeasors, especially if the criminal laws fail to do so"; (c) the general deterrent effect depends upon the perception that the actual wrongdoer is punished and is no less than diminished when it impacts only blameless heirs; and (d) an opposite decision "would result in our adopting a principle that would allow a decedent's

---

8. Instruction No. 8.12, Hawai'i Civil Jury Instructions, 1999 edition, fails to advise the jury that "facilitating payment of a plaintiff's attor-

ney's fees is one of the purposes of punitive damages[.]" *Lee v. Aiu,* 85 Hawai'i 19, 35, 936 P.2d 655, 671 (1997).

widow and children to be placed on welfare for the decedent's wrong." *Lohr*, 522 So.2d at 846–47.

Reason (b) erroneously concludes that (1) punitive damages do not have a general deterrent effect and (2) the criminal laws fail to deter other prospective tortfeasors. Assuming the imposition of punitive damages and the application of the criminal laws fail to deter all other prospective tortfeasors, they deter a substantial number of them.

We disagree with reason (c). In our view, the general deterrent effect is greatly increased in situations where the judgment for punitive damages substantially impacts the finances of the tortfeasor's surviving spouse, dependents, and other relatives, friends, and loved ones.

Reason (d): (1) fails to recognize that the award of punitive damages considers the tortfeasor's (or the tortfeasor's estate's) financial condition; (2) does not satisfactorily explain why the impact of the judgment for punitive damages upon a deceased tortfeasor's widow and children bars the judgment when the impact of the judgment for punitive damages upon a living tortfeasor's wife and children does not; and (3) assumes facts that may or may not be facts. The tortfeasor may not be married, may not have children, may have a net estate of a value greatly in excess of the amount of the uninsured judgment, may have a spouse and/or children who is/are financially independent, and/or may have left his/her estate to one or more beneficiaries other than a surviving spouse and/or children.

It has been argued that a judgment for punitive damages should not be entered against a deceased tortfeasor because "sound public policy dictates that punishment should not befall blameless individuals." Paul Minnich, Comment, *Punitive Damages and the Deceased Tortfeasor: Should Pennsylvania Courts Allow Punitive Damages to be Recovered from a Decedent's Estate?*, 98 DICK. L.REV. 329, 349 (1994). This argument is not persuasive. The fact that the size of the tortfeasor's estate would be reduced is not a valid reason for not entering the judgment for punitive damages against the tortfeasor's estate. The beneficiaries of the estate of the tortfeasor have no right or entitlement to more than the tortfeasor would have had if he or she had lived, or to more than the net of the tortfeasor's estate after payment of all legal obligations, including judgments against the estate for punitive damages.

Purposes 3 (facilitate payment of attorney fees) and 5 (general deterrence) are achieved by the imposition of punitive damages whether or not the tortfeasor is alive when the judgment is entered. Whether or not the tortfeasor dies prejudgment, the imposition of punitive damages upon the estate of a tortfeasor (a) may reimburse the attorney fees of the victim(s) and (b) will motivate others not to engage in similar action in the future. For example, as compared to a vehicle driver who knows that punitive damages cannot be imposed on his or her estate if he or she dies prejudgment, a vehicle driver who knows that punitive damages may be imposed on his or her estate and spouse, dependents and/or other loved ones if he or she dies prejudgment has more reason and motivation to avoid the kind of driving that will result in the imposition of punitive damages.

█ Comparing the purposes of punitive damages that can and cannot be achieved after the death of the tortfeasor, we disagree with the majority of jurisdictions which have concluded that judgments for punitive damages may not be entered against the estate of a deceased tortfeasor. Our position is supported by the following two recent cases: *G.J.D. v. Johnson*, 552 Pa. 169, 713 A.2d 1127 (1998), and *Haralson v. Fisher Surveying, Inc.*, 201 Ariz. 1, 31 P.3d 114 (2001).

## CONCLUSION

Accordingly, we affirm (1) the June 1, 2000 Judgment in favor of Kaopuiki/Enos against the Kealoha Estate in the amount of $5,000, (2) the June 1, 2000 Judgment in favor of Kaopuiki/Enos against the Kealoha Estate in the amount of $5,000, (2) the August 15, 2000 "Order Denying Plaintiff's Motion for a New Trial," and (3) the March 5, 1996 "Order Granting Motion for Summary Judgment of Defendant Fletcher Pacific Construction Co., Ltd." We vacate the December 16, 1999 "Or-

der Granting Defendants Sonia Esther Kealoha and Doreen Kusunoki, Co–Personal Representatives of the Estate of Russell Kalani Opio Kealoha's Motion for Summary Judgment on the Plaintiff's Claim for Punitive Damages and Order Denying William P. Enos' Motion for Partial Summary Judgment As to Liability for Punitive Damages Against the Estate of Russell Kalani Opio Kealoha," which ordered "that Punitive Damages are not awardable against the Estate of Russell Kalani Opio Kealoha," and remand for further proceedings consistent with this opinion.

Opinion Concurring in Part and Dissenting in Part by LIM, J.

I concur with the majority that there was no trial error in this case, and that Fletcher Pacific was properly granted summary judgment. I believe, however, that the circuit court correctly joined the majority of jurisdictions in granting the Kealoha Estate's motion for summary judgment on punitive damages, and to that extent, I respectfully dissent.

I find the majority's purview of the various scenarios of a tortfeasor's death vis á vis the time of judgment or judgment on appeal fascinating and enlightening, but I prefer to attend to the task at hand; that is, deciding this case. In this case, the tortfeasor drove drunk and died in the very accident giving rise to the cause of action. All of the classic purposes of punitive damages were thereby pluperfectly fulfilled. *See Masaki v. General Motors Corp.,* 71 Haw. 1, 16, 780 P.2d 566, 575 (1989) ("the fundamental purpose underlying an award of exemplary or punitive damages is to punish the wrongdoer and to deter him and others from committing similar wrongs and offenses in the future" (citations omitted)). Here, the tortfeasor suffered the ultimate punishment. He was, in a manner of speaking, permanently deterred. And as for general deterrence, what was dealt to him was, *pace* the Kealoha ʻohana, poetic justice. What additional example the imposition of punitive damages might set in this case seems paltry, especially where collateral justifying purposes, *id.* at 8 n. 2, 780 P.2d at 571 n. 2, such as "facilitating payment of a plaintiff's attorney's fees[,]" *Lee v. Aiu,* 85 Hawaiʻi 19, 35, 936 P.2d 655, 671 (1997), are advanced amidst a smell of attainder.